IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LISA MESSINA and NICK MESSINA, the parents and sole heirs at law of Andrew Messina, and the ESTATE OF ANDREW MESSINA, by and through the Administrator of the Estate, | CIVIL ACTION FILE NO. |
| Plaintiffs, | JURY TRIAL DEMANDED |
| v. | |
| JASON YARBROUGH, | |
| Defendant. | |

## COMPLAINT FOR DAMAGES

COME NOW, Lisa Messina and Nick Messina, the parents and sole heirs of Andrew Messina, along with the Estate of Andrew Messina, and submit this Complaint for Damages against Defendant Jason Yarbrough and in support thereof respectfully show the following:

## NATURE OF CAUSE OF ACTION

This is a civil action claiming monetary damages for the violation of the federally protected civil rights, wrongful death, and pain and suffering in advance of death of Andrew Messina. The decedent was the son of Lisa Messina and Nick Messina and an unmarried minor without children. Lisa Messina and Nick Messina are the sole heirs of Andrew Messina and are entitled to bring this action

1

for the wrongful death of their son.  The Estate of Andrew Messina is authorized to maintain this action through the Administrator of the Estate for Andrew Messina's pain and suffering in advance of his death and for other damages as provided by statute.

## JURISDICTION

1.

This Court has jurisdiction over this action, which arises under the laws and Constitution of the State of Georgia and the Constitution and laws of the United States.  Defendant resides within the Northern District of Georgia and was acting as a law enforcement officer employed by the Cherokee County, Georgia Sheriff's Department, located within this District, at all times relevant to this action. Plaintiffs initially brought their claims herein on August 9, 2013 and that case was dismissed without prejudice upon motion and the Court's Order on October 31, 2014.  Plaintiffs' re-filing in the instant action is timely pursuant to applicable Federal Rules of Civil Procedure.

## VENUE

2.

Venue is proper in this Court as the actions giving rise to this lawsuit occurred in Cherokee County, Georgia within the Northern District of Georgia.

## PARTIES

3.

Lisa Messina and Nick Messina were Andrew Messina's parents and are his sole heirs at law.   Lisa Messina's and Nick Messina's claims against Defendant Yarbrough are timely asserted.   Lisa Messina has executed a Petition for Letters of Administration in the Probate Court of Cherokee County, Georgia so as to act as the duly appointed administrator of the Estate of Andrew Messina.   Georgia law provides that the time between the death of a person and the date of the appointment of their estate representative shall not be counted against his estate. The claims of the Estate of Andrew Messina are timely asserted herein.

4.

Upon information and belief, Defendant Jason Yarbrough is, and was at all times relevant to this action, a Cherokee County Sheriff's Department Deputy and, to Plaintiffs' knowledge, is a resident of Cherokee County and resides within the Northern District of Georgia.   Defendant Yarbrough deliberately, recklessly, and without justification shot and killed Andrew Messina during the incident giving rise to this action.   Defendant Yarbrough may be served with process at the offices of the Cherokee County, Georgia Sheriff's Department, 498 Chattin Drive, Canton, Georgia 30115.

## FACTS

5.

On May 1, 2012, Andrew Messina (hereinafter sometimes referenced as "Andrew"), a sixteen-year old student at Etowah High School in Cherokee County, Georgia was shot and killed while in his home at 921 Laurel Crest Drive, Woodstock, Georgia by Cherokee County Sheriff's Department sniper, Defendant herein, Deputy Jason Yarbrough.

6.

As set forth in detail *infra*, various officers of the Cherokee County Sheriff's Department were dispatched to the Messina home after Andrew Messina's mother, Lisa Messina, called 9-1-1 because he had possession of his father's handgun and had threatened to kill himself.  Mr. and Mrs. Messina did not necessarily believe that Andrew actually intended to commit suicide but were worried that in his agitated state he could accidentally hurt himself with the gun.

7.

After Cherokee County Sheriff's Department personnel arrived at the scene, Andrew, in telephone contact with law enforcement personnel and "live" discussions with officers positioned outside of the house, refused to leave the house and periodically threatened to harm himself.  However, at no time whatsoever did Andrew ever act in a combative or hostile manner toward any

4

Cherokee County law enforcement officer. At no time whatsoever did Andrew ever deliberately threaten any law enforcement officer with the gun or take any other aggressive action toward any officer. Indeed, at the time that he was shot, Andrew had his back toward the officers, whom Defendant Yarbrough later claimed he was trying to protect by shooting Andrew, and could not have threatened them from such a position.

8.

Earlier that afternoon Andrew had arrived home from school and discussed his day with Lisa Messina including, in particular, a "zero" he had received on a homework assignment attributable to his absence from a class that day.

9.

While they were talking, Mr. Messina telephoned while on his way home from work and spoke with Andrew who then became upset and defensive saying that he would run away from home. In an attempt to lighten the discussion, Mr. Messina asked Andrew how he thought he could possibly live on his own. However, rather than joking him out of his mood, this caused Andrew to become even more upset and despondent. He said that he would get Mr. Messina's gun and just kill himself. Andrew then retrieved an unloaded .357 caliber revolver owned by Mr. Messina and a bag of ammunition kept separately from the gun.

10.

Andrew waved the unloaded gun around, gesturing toward his mother with it and then threatened to kill himself.  At this point, Mr. Messina told Mrs. Messina to call 9-1-1.  She called and reported that her teenage son was threatening to kill himself.  The 9-1-1 operator with whom she spoke directed her to go outside until law enforcement arrived and she did so.  At no time did Andrew threaten to shoot Mrs. Messina with the gun nor did he in any way restrain her or attempt to keep her from leaving the house.  Lisa Messina never saw Andrew load the gun.  It was unloaded the entire time that she was in the house.

11.

Both Mr. and Mrs. Messina were concerned for Andrew's safety because of his agitated state and his handling of the gun.  To their knowledge, Andrew had never even held a gun before and, while they did not believe that he would intentionally kill himself, they were worried that he would accidentally hurt himself.  As such, they called 9-1-1 out of concern for their son not because of any fear for Mrs. Messina's safety.

12.

Lisa Messina called 9-1-1 and then left the house at approximately 5:53 p.m.  She called for help as a concerned parent who had no experience dealing with such a situation and not as the victim of any crime.  After going outside, she continued

to speak with the 9-1-1 operator from the back deck of the house using a cordless phone.  Nick Messina continued to speak with Andrew on the other house phone line as he tried to make his way home from work.  Andrew was despondent and very self-critical and repeatedly expressed suicidal thoughts but never threatened to harm his mother, who was just outside the back door, or anyone other than himself.

13.

From his experience as Andrew's father and the tone of their conversation, Mr. Messina did not think that Andrew was actually suicidal but he shared Mrs. Messina's concern that Andrew could accidentally hurt himself with the gun and was relieved that she had called 9-1-1 for help since he was not yet home.  At that point, Mr. and Mrs. Messina both believed that law enforcement would be better able to help their son and safely resolve the situation than they would be.

14.

At approximately 6:00 p.m., the first Cherokee County Sheriff's Department representatives arrived at the Messina home.  Defendant Captain Chris Higgins, and Sgt. William Painter along with Deputies Kenneth Johnson and Ben Botzong were among the first on the scene.  As the ranking officer present and the Shift 4 Supervisor, Captain Higgins assumed command of the scene and positioned deputies around the house while they awaited the arrival of additional personnel.

15.

While en route to the scene, Captain Higgins had directed Corporals Casey McLeod and Kyle Nowick, who were SWAT team members and on-shift at that time, and Crisis Negotiation Team members to report to the Messina home. He later also requested that Criminal Investigation Division ("CID") investigators be dispatched to the scene in case a search warrant of the residence needed to be prepared.

16.

While on the phone with Mr. Messina, Andrew saw law enforcement personnel arriving and taking up positions in the front yard with assault rifles and became frantic. Their deployment escalated the level of his anxiety and the tension of the situation.

17.

When deputies arrived at the house Lisa Messina allowed Sgt. Painter to use the phone to try to speak with Andrew. When he attempted to dial the Messina's phone number he was connected to the other phone line on which Andrew was already speaking with Nick Messina. Eventually, Sgt. Painter introduced himself and spoke briefly with both Andrew and Mr. Messina.

18.

Mr. Messina then got off of the line because he believed that law enforcement personnel were there to help and best qualified to resolve the situation. After Mr. Messina hung up, Andrew allegedly told Sgt. Painter that he did not want to come out of the house and did not want the police to come inside. Sgt. Painter reported this statement to Cpt. Higgins who at approximately 6:13 p.m. radioed that the scene had become a "barricade" situation.

19.

At approximately the same time, additional officers arrived and were deployed in various positions around the house. Cpl. McLeod was deployed as a sniper and Sgt. Charles Westbrook, a member of the Department's Crisis Negotiation Team, attempted to negotiate with Andrew by telephone.

20.

Sgt. Westbrook had several sporadic telephone calls with Andrew but was unable to continue as the battery for the headphones he was using ran down. Prior to this, Sgt. Westbrook and Mr. Messina had been speaking with Andrew contemporaneously and Sgt. Westbrook requested that Mr. Messina not speak with Andrew any further as it was distracting and he did not think it was helpful to the negotiation process.

21.

At approximately 6:32 p.m. Cpt. Higgins requested that the full Department SWAT team be dispatched to the scene.

22.

Ultimately, rather than continuing to speak with Andrew by phone, Sgt. Westbrook and Cpl. Nowiak, eventually joined by Lieutenant Jeanette Vetter, took up a position around the corner of the house immediately to the left (facing the house) of the front door and behind a portable ballistic shield. This allowed them to communicate directly with Andrew from a protected position while he was in the foyer area immediately inside of the front door.

23.

Nick Messina arrived at the scene at approximately 6:45 p.m. and met with Cpt. Higgins and other officers in the staging area away from the house along with Mrs. Messina. Shortly thereafter the SWAT team arrived, including a "Bearcat" armored assault vehicle and Defendant Yarbrough, an additional sniper. Cpt. Higgins directed the team to stage at the subdivision pool area and await further instructions and requested that Defendant Yarbrough report directly to the scene.

24.

Mr. and Mrs. Messina saw Defendant Yarbrough approach the staging area and noticed that he was wearing tactical "fatigue-type" apparel rather than the

Department uniforms worn by most of the other officers present and saw him carrying a large rifle case.  They were alarmed by his appearance and what they perceived as a shift in the behavior of the officers from trying to help their troubled teenage son to a tactical deployment and escalation of the situation into an adversarial stand-off.

### 25.

According to Cpt. Higgins, Defendant Yarbrough was directed to come forward prior to the rest of the SWAT team because snipers are often used to gather and relay intelligence to commanders in such situations given their positioning and use of high-powered optics.  When Defendant Yarbrough arrived, Cpt. Higgins pointed out the house and the location of Cpl. McLeod, the other Department sniper.  Defendant Yarbrough was not given and did not request additional material information such as Andrew's age, that there were no hostages in the house, and/or the type of gun in Andrew's possession.  Moreover, Defendant Yarbrough has stated that thereafter, upon setting up in his firing position, he did not maintain communication with Cpt. Higgins or other supervisory personnel and did not even pay attention to radio traffic regarding the incident.

### 26.

Defendant Yarbrough then moved to a position near the front door of the house directly across the street from the Messina's; 918 Laurel Crest Drive.  This

position was approximately one hundred and sixty (160) feet away and elevated from the Messina's front door due to the sharp upward slope of their neighbors' lawn.

27.

Defendant Yarbrough set up his .308 caliber sniper rifle and assumed a prone firing position from which he could see the Crisis Negotiation Team, the other deputies deployed around the Messina's house and yard, and into the foyer area of the house. He was not in direct contact and did not communicate with Cpt. Higgins or any other supervisory personnel.

28.

The deployment of officers around the house had escalated the tension of the situation to such an extent that Andrew had earlier begun drinking alcohol. Officers could see him drinking through the front door and it was obvious that he was inebriated. Andrew also began pouring various alcoholic beverages on the floor of the foyer area saying that he wanted to burn the house down.

29.

While in this highly agitated state, Andrew let the family dog out of the back door and onto the adjacent deck. While doing so, Andrew spoke with Department Investigator Hands, who had been stationed to watch the back door of the house, and asked that he take care of the dog.

30.

Andrew then returned to the foyer area near the front door and periodically spoke with Sgt. Westbrook. He continued drinking saying that he had never been drunk before and repeated that he would set the house on fire. After approximately ten minutes Andrew retrieved the dog from the back deck, as officers had not removed it, and brought it back inside.

31.

Subsequently, after further discussion with Sgt. Westbrook, Andrew opened the front door and let the dog out onto the porch so that members of the negotiation team, who were positioned behind the portable ballistic shield and around the corner of the house, could retrieve it. While the door was open, Andrew made no aggressive action toward the negotiation team members or the other officers deployed around the yard. Rather, he held the gun so that it was pointed upward under his chin.

32.

Defendant Yarbrough, despite having been brought forward in advance of the rest of the SWAT team to provide intelligence to Cpt. Higgins had no direct communication with Cpt. Higgins or other supervisory personnel and, although he had his radio turned on, later stated that he had not been paying attention to it until

immediately prior to shooting Andrew.  At approximately 7:18 p.m., Defendant Yarbrough announced over the radio that Andrew had opened the front door and was letting the dog out.  Upon information and belief, he also then directed an unidentified officer (presumably one of the negotiation team members) not to move any further to the right so as to remain out of his field of fire.

33.

After he let the dog out, Andrew closed the front door and while facing away from the negotiation team struck a glass pane in the front door.  The pane broke and immediately thereafter, without warning, provocation or authorization, Defendant Yarbrough shot Andrew through another glass pane in the front door.

34.

At the time that he was shot, Andrew was facing away from the negotiation team located behind him and to his right outside of the front door.  Andrew could not have threatened or fired upon the negotiation team from this position.  No officer's safety was in jeopardy prior to or at the time that Defendant Yarbrough shot Andrew.

35.

Andrew was shot with one .308 caliber round through the side of his right abdomen at approximately kidney-level and the bullet exited through his lower left back.

36.

Andrew never fired the handgun nor did he point it toward any of the officers or thrust it outward through the broken glass pane immediately prior to being shot by Defendant Yarbrough.

37.

At approximately 7:21 p.m. Defendant Yarbrough announced over the radio that he had fired one shot and members of the negotiation team, who were nearest to the front door, converged upon the house.  Emergency medical personnel who had been staged away from the house were also directed to move forward and entered the house approximately two to three minutes later.

38.

Andrew was not killed instantly by Defendant Yarbrough's bullet.  When officers and emergency medical personnel entered the house he was alive on the floor of the foyer and bleeding profusely.  The EMTs tried to stop the bleeding and stabilize Andrew and were inside of the house for approximately five minutes before transporting him by ambulance to the Emergency Department at Kennestone Hospital.  He died thereafter and the County coroner was paged to Kennestone Hospital at approximately 8:54 p.m. to certify his death.

39.

Defendant Yarbrough's intentional, reckless, and unjustified conduct was the direct and proximate cause of Andrew Messina's death and the excruciating pain, trauma, and mental anguish that he suffered prior to his death.

40.

The shooting of Andrew Messina on May 1, 2012 violated the protocol for the use of deadly force that was recognized and accepted in the law enforcement profession on May 1, 2012 and codified within Cherokee County Sheriff's Department documents. Defendant Yarbrough's deliberate failure to follow the protocol for the application of such force constituted a failure to fulfill his responsibility as a law enforcement officer for the safety of Andrew Messina, demonstrated a reckless disregard for his safety, and was causally connected to his death.

41.

Law enforcement professional associations, such as the International Association of Chiefs of Police (IACP), promulgated training documents and recommended protocol, prior to May 1, 2012, describing an officer's responsibility in the use and application of deadly force. The State of Georgia, through training protocols and exercises provided through the Georgia Peace Officers Training

Council, provided detailed information about the use and application of deadly force by law enforcement personnel.

42.

Law enforcement officers in Georgia receive training in the proper and limited scope of the use of deadly force in the basic law enforcement training program and subsequent training sessions.

43.

In this incident, Defendant Yarbrough's shooting of Andrew Messina was patently unreasonable and was not justified under the clearly established protocol for the use of deadly force by Cherokee Sheriff's Department personnel.

44.

The protocol for the use of deadly force by Cherokee County Sheriff's Department personnel states that officers are tasked with applying various force options as deemed appropriate for individual circumstances.  Pursuant to this protocol deadly force may not be used unless an officer reasonably believes that an offender has the ability and opportunity to harm a third party and that such a third party is in imminent danger of serious bodily injury or death.

45.

The protocol defines the "ability" to harm as being in possession of a weapons system.  In order to establish the second element necessary for the

17

application of deadly force, "opportunity", an offender must be within range so as to be able to deploy the weapon in his possession against a third party.

46.

The third required element for the application of deadly force, "jeopardy", is defined as the commission of an overt act by an offender causing an officer to believe that a third party or that officer is in imminent danger of serious bodily harm or death.

47.

Andrew Messina was in possession of a weapons system, his father's revolver, on May 1, 2012 and potentially had the ability to harm third parties. However, he made no attempt to inflict such harm and there is even a question as to whether the gun was loaded during the incident.

48.

Immediately prior to and at the time that he was shot by Defendant Yarbrough, Andrew, a teenage boy with no firearm experience, did not have the opportunity to harm any of the officers deployed across his front yard as he was inside of the house behind the closed front door. Immediately before being shot he had opened the front door so that officers could take care of his dog but had not threatened officers while doing so and then closed the door without incident.

49.

Moreover, immediately prior to and at the time that he was shot, Andrew was facing away from the negotiation team members, whom Defendant Yarbrough has claimed he had been trying to protect by shooting Andrew, as they were deployed outside and around the corner of the house behind a ballistic shield. Andrew was shot through his right lower abdomen with the bullet exiting his left lower back conclusively demonstrating that he did not have the physical opportunity to cause harm to the negotiation team members when he was shot and the absence of such an opportunity should have been obvious to Defendant Yarbrough.

50.

For the same reason, no officer was in jeopardy of imminent danger of serious injury or death at the time that Defendant Yarbrough shot Andrew. Andrew had made no overt action, as required by Department protocol, which could reasonably have caused Defendant Yarbrough to believe that any officer, and especially not any negotiation team member, was in such jeopardy. The accidental breaking of the glass pane in the front door to Andrew's right and facing directly out into the front yard of the house was not an overt action such that Defendant Yarbrough could reasonably conclude that the negotiation team members, who were located outside of the house, around the corner from the front door, and

behind a ballistic shield in the opposite direction from which Andrew was facing, were in imminent danger of serious injury or death.

51.

Law enforcement professional associations, such as the International Association of Chiefs of Police (IACP), have promulgated standard and recommended policies and procedures for the use of snipers by law enforcement agencies, prior to May 1, 2012, describing the proper use and deployment of such personnel and their application of deadly force.  The State of Georgia, through training protocols and exercises that have been provided over the course of many years through the Georgia Peace Officers Training Council, has promulgated detailed information about the use and deployment of law enforcement snipers and the use of deadly force by such personnel.

52.

The shooting of Andrew Messina by Defendant Yarbrough, while acting as a law enforcement sniper, was patently unreasonable and was not justified under clearly established and  commonly accepted standard protocols for the deployment of such snipers and demonstrated a reckless disregard for the safety of subjects such as Andrew Messina and this failure was causally connected to his death.

53.

In this incident, Defendant Yarbrough deployed as a sniper without knowledge of Andrew's age, the type of firearm he had in his possession, or that Andrew was alone and that there were no hostages in the house.

54.

Further, Defendant Yarbrough failed to maintain radio communication with Cpt. Higgins or any other supervisory personnel prior to the shooting.  Defendant Yarbrough has stated that prior to the shooting he was not even paying attention to any radio traffic from other on-scene officers and supervisors.

55.

Defendant Yarbrough's conduct prior to and at the time he shot Andrew Messina fell well below the standard of care for a law enforcement sniper in 2012 and demonstrated a reckless disregard for the safety of subjects such as Andrew Messina and this failure was causally connected to his death.

## CAUSES OF ACTION

1.

Defendant Yarbrough's conduct while acting as a law enforcement officer directly resulting in Andrew Messina's death demonstrates a reckless disregard for the safety of subjects and the clearly established rights of such subjects to be free

from unreasonable and excessive force in violation of the Fourth Amendment of the United States Constitution as applicable through the Fourteenth Amendment.

2.

Andrew Messina suffered in body and mind in advance of his death and suffered his death as a direct and proximate result of the above-referenced actions and omissions of Defendant Yarbrough.

3.

Andrew Messina was the object of excessive force in advance of his death and he died as a result of Defendant Yarbrough's use of excessive force - in contravention of the Cherokee County, Georgia Sheriff's Department regulations and clearly established and commonly accepted standard protocols for the use and conduct of law enforcement snipers.  The patent failure of Defendant Yarbrough to comply with such protocols directly resulted in Andrew Messina's death and demonstrated a reckless disregard for the safety of subjects and the rights of such subjects to be free from unreasonable and excessive force in violation of the Fourth Amendment of the United States Constitution as applicable through the Fourteenth Amendment.

4.

The above-referenced actions and omissions of Defendant Yarbrough proximately and in fact resulted in the wrongful death of Andrew Messina.

5.

The above-referenced actions and omissions of Defendant Yarbrough while in the performance of official functions as a law enforcement officer constitute the use of excessive force in violation of clearly established Georgia statutory and common law and in violation of the Constitution of the State of Georgia.

6.

The above-referenced actions and omissions of Defendant Yarbrough in the use of force against Andrew Messina while in the performance of official functions as a law enforcement officer were not objectively reasonable under Georgia law and were undertaken with the actual intent to cause injury to Andrew Messina.

7.

The above-referenced actions and omissions of Defendant Yarbrough constitute a violation of the Georgia Constitution, GA CONST Art. 1, § 1, ¶ XIII, with respect to seizures of persons.

8.

The above-referenced actions and omissions of Defendant Yarbrough constituted negligent, and/or intentional, and/or malicious conduct and proximately caused the death of Andrew Messina and his mental and physical suffering in advance of his death.

## **PRAYER FOR RELIEF**

WHEREFORE, on the basis of the above and foregoing, the Plaintiffs respectfully demand a Jury Trial, pray judgment against the Defendant herein, and pray that this Court award the following relief:

a.     ACTUAL, GENERAL AND CONSEQUENTIAL DAMAGES, including, but not limited to, the full value of the life of Andrew Messina in an amount to which the Plaintiffs are entitled for the wrongful death of Andrew Messina as shown by the evidence to be determined by the enlightened conscience of impartial jurors; together with costs of this action; and

b.     ACTUAL, GENERAL AND CONSEQUENTIAL DAMAGES, including the pain and suffering endured by Andrew Messina in advance of his death and including all other damages properly awarded to the Estate of Andrew Messina pursuant to the laws of the State of Georgia.

c.     That Plaintiffs recover such other and further relief as this Court may deem just and proper.

d.     Trial by jury as to all issues so triable.

Respectfully submitted, this 27th day of April, 2015.


/s/ David A. Cox
Charles B. Pekor
Georgia Bar No. 570601
David A. Cox
Georgia Bar No. 192381

Pekor & Associates LLC
3565 Piedmont Road
Building 1, Suite 460
Atlanta, Georgia 30305
404-848-8086 Tel
404-848-8089 Fax
chuckpekor@yahoo.com
dacox@dacoxlaw.com
*Attorneys for Plaintiffs*

## LOCAL RULE 5.1 CERTIFICATION

I certify that this pleading was prepared in Times New Roman (14 point) font, a font and point selection approved by L.R. 5.1.

This 27th day of April, 2015.

/s/ David A. Cox
David A. Cox